### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JONATHAN WILLIAM BEDDER,

         Petitioner,

   v.

SARAH REBECCA BEDDER,

         Respondent.

Case No. 1:13-cv-02

Bowman, M.J.

### MEMORANDUM OPINION AND ORDER

### I. Procedural Background

On January 2, 2013, Petitioner Jonathan William Bedder filed the instant petition, in order to seek the return of his minor daughter, "R," to Canada.[1]  Petitioner alleges that his daughter was wrongfully abducted to the United States by his estranged wife, Respondent Sarah Rebecca Bedder.  Respondent, through counsel, filed her Answer on January 25, 2013, denying wrongful removal.

The undersigned conducted a telephonic case management conference on February 4, 2013, at which both parties and their respective attorneys telephonically appeared.  At the conference, this Court set an evidentiary hearing to begin on Thursday, February 07, 2013, to be continued as necessary to Friday, February 8, 2013.[2]  All evidence was concluded on February 7, 2013.

---

[1]In accordance with Rule 5.2, Fed. R. Civ. P., the minor child has been identified only as "R" in the publicly filed opinion of this Court. However, for purposes of enforceability of this Order, an unredacted version containing R's full name has been provided to all parties and, if needed, will be made available to law enforcement.

[2]The petition was initially assigned to United States District Judge Sandra Beckwith and referred to the undersigned magistrate judge for preliminary proceedings.  During the case management conference, the parties verbally consented to full disposition by the undersigned magistrate judge.  On February 5, 2013, the parties filed written consents.  (Docs. 6-7).

### II.  Factual Findings

Sarah and Jonathon met as undergraduate students in New York.  Petitioner is a Canadian citizen, while Respondent and R are United States citizens.[3]  The couple completed their undergraduate degrees and subsequently married in June of 2008, beginning married life in Jonathon's apartment in upper Manhattan.  Their daughter was born on October 5, 2009 during their sojourn in New York.  Petitioner stayed home with R during her first year of life, while his wife worked outside the marital home during that first year.  At some point in time, Sarah's outside employment ended.  Because Petitioner's degree and interest is in computer science, he sought work in that profession.  Although he initially found contract work that he could generally perform at home, over time it became apparent that neither he nor Sarah could fully financially support themselves or their daughter in New York.   During periods of financial struggle in New York, the couple sought and obtained financial assistance from Petitioner's mother, a physician who resides in Canada.

In or about late 2010 or early 2011, the couple decided to move to Seattle, Washington, where Petitioner hoped to find more sustainable employment.  Petitioner's biological father and stepmother also resided in Seattle, providing additional social (and limited financial) family support. During the family's time in Seattle, the couple's marital problems, which had been present but less severe in New York, began to worsen.  Both testified that Respondent was primarily responsible for caring for R, cooking, and running the household, while Petitioner either performed contract work or sought

---

[3]Respondent insinuated during her testimony that R had dual citizenship and/or that Petitioner was in the process of obtaining dual citizenship.  To the extent that there is any ambiguity in the record concerning the citizenship of the parties, it is not relevant for purposes of this action.

additional work.  Because Petitioner was still unable to financially support the family and Respondent did not earn income, Petitioner's mother continued to provide the primary financial support for the couple, sending them approximately $5,000 per month to cover the cost of R's preschool and myriad activities, as well as basic expenses for rent, food, and clothing. Without belaboring the point, which is evidenced by pictures entered into the record, the hygienic condition of the apartment the family was renting became deplorable, to the point that they were lawfully evicted on June 30, 2012.  Both Petitioner and Respondent testified that they were warned by the landlord repeatedly about the unsanitary and squalid condition of the apartment prior to eviction.

Prior to receiving the eviction notice, the couple had jointly decided that Respondent should take R for a month-long summer visit to her parent's home in Cincinnati in July, while Petitioner finished up some work in Seattle, and that all three would visit Petitioner's family in August, so that R could spend some time with both sets of grandparents.  Once the family was evicted, their plans changed slightly, in that Petitioner flew home to Canada in late June, and Respondent's and R's travel was re-booked to fly from Cincinnati to Canada on July 30, 2012.  At the time they were evicted, both hoped to eventually return to Seattle and find a new apartment.  On June 14, 2012, they executed a Statutory Declaration indicating that R would be traveling from Cincinnati to Winnipeg on July 30, and returning to Seattle on September 2, 2012. They placed some of their belongings in storage, and sought the assistance of Petitioner's father in finding a new apartment.  However, based on a combination of Sarah's criteria for a new apartment, and the circumstances of their prior eviction, it

became obvious by the time Respondent arrived in Canada with R at the end of July that finding a new apartment in Seattle would be extremely difficult.

Respondent testified that on the day of her arrival, the couple began to discuss staying in Canada as an alternative to returning to Seattle.  R's grandparents, financially secure as a lawyer and a physician, offered to let the young family live with them for an indefinite period of time.  The couple had a bedroom and bathroom in a finished basement area, while R had her own bedroom on the second floor adjacent to her grandparents' bedroom.  Within days, Respondent enthusiastically agreed to the proposal, without any (expressed) reservation.

The couple canceled Respondent and R's return tickets to Seattle, notified R's Seattle preschool that she would not be returning, and canceled their U.S. health insurance.  They engaged in extensive activities to complete their family's relocation to Canada.  They went shopping and purchased clothing and additional toys, since they had originally planned to stay for only a month.  Respondent requested that a few small items be sent to their new home in Winnipeg, and the remaining items originally placed in storage in Seattle were eventually sold or donated to charity.

With his parents' financial support and encouragement, Petitioner enrolled in additional computer certification courses.  The couple obtained a Canadian health insurance card for R, and almost immediately enrolled her in a local religious preschool three mornings per week.  Respondent writes several blogs, and her contemporaneous blog entries are telling.  In August she wrote "I'm so grateful that there was nothing really tying us to Seattle so we had the option to just stay here instead of returning to Seattle."  In September, she wrote about R's enrollment in her new Canadian preschool.

"I'm so grateful that there's a religious preschool here that's comparable to MMSC in Seattle.  (Preschool was the only possible reason to return to Seattle but obviously that wasn't an issue.)."

The couple enrolled R in swimming lessons, and engaged in all the typical activities one would do with a three-year-old in a home environment, taking R frequently to a nearby park and the zoo, as well as to their local synagogue.  R socialized not only with her grandparents, but with extended family who visited them in Winnipeg.  Although R socialized with other children primarily at school, Petitioner's grandmother testified that R also was invited to the birthday parties of her preschool friends.  Despite Respondent's contrary testimony about R's socialization, her September blog entry reports, "A fellow preschool mom invited the three of us to her house for a Shabbat lunch."  In October, Respondent wrote:  "Thank you. God.  My daughter [R] is alive and very healthy with all her basic needs met easily, daily: food, clothing, and shelter. …Thanks also for providing a good Jewish community for us, including but not limited to:  Chabad Torah Tots preschool, Herzlia synagogue, the JCC, and the JCFS.  You have definitely sent me many angels to help along the way, especially Rabbi and Reebbetzin Ellis (from the synagogue)."

By early September, 2012, the couple had met with an immigration lawyer, who explained the requirements for Sarah to obtain permanent legal residency in Canada.  Despite their obvious and serious marital problems, the couple still hoped to work out their differences.  Initially, Jonathon expressed a willingness to legally sponsor Sarah – a Canadian legal commitment to be financially responsible for her for a period of three years.  However, during a family counseling session on or about September 20, 2012,

Petitioner conveyed to Respondent that he did not think their marriage would survive. On that day or shortly thereafter, he advised Respondent that he would not sponsor her.

Respondent reacted with anger, but expressed no intention to leave Canada prior to December 2012. To the contrary, she continued to live – with the consent of all involved – in her basement quarters, and R continued to sleep in her second-floor bedroom. The couple considered themselves separated as of September, when Jonathon moved to the main floor of his parents' home and began sleeping on the couch. Sarah testified that she continued to pursue her options for remaining in Canada by consulting with another immigration lawyer. Respondent looked into obtaining a work permit, another sponsor, or extending her visitor's visa, which was valid on its face until January 30, 2013 and could be extended for up to 2 years. Although Respondent testified that she believed that it would be "difficult" to extend her visa without showing that she had some money in a bank account, Petitioner testified that he believed extensions were routine under the circumstances, and that nothing was required but a letter request. It is unnecessary to resolve this issue of law. Respondent made no request to extend her visitor's visa, and did not ask Petitioner for funds or other assistance to extend the visa.

Respondent repeatedly testified that she made a "good faith effort" to remain in Canada and that she intended to remain in Canada if she could. She testified that she pursued employment opportunities in part through the local Jewish community, and through that community she was able to obtain one job interview in November. As a result of that interview, she was initially offered training to become a kosher inspector at

a bakery, but that position fell through in early December. When that occurred, the Jewish community offered to help her find a different position.

In mid-November, Respondent and Petitioner had an argument about the impending break-up of their marriage, during which Respondent told Petitioner that if he would not sponsor her and she was forced to leave Canada, she would take R. Petitioner advised Respondent she would not be permitted to do that, and that his parents had placed R's passport in a safe deposit box to prevent her from such action. Respondent suggested, and equivocally testified, that Petitioner knew or should have known from the start that Respondent's move to Canada was conditioned on the success of her marriage and corresponding ability to remain legally in Canada with her daughter. However, Respondent frequently contradicted herself regarding these intentions, and the Court finds credible Petitioner's testimony that Respondent never expressed (or held) any intention to leave Canada with R until, at the earliest, the November argument. When asked where she believed R's habitual residence might be, if not Winnipeg, Respondent was unable to answer other than "the United States." She testified that she never made any effort to return to Seattle after arriving in Canada, but also disavowed Cincinnati as R's "habitual residence."

On or about December 1, Respondent and Wayne Leach, R's grandfather, had a serious discussion. Mr. Leach told her that they could not all go on living indefinitely in the stressful environment without a plan for moving forward. Although Respondent testified that Mr. Leach gave her a two-week ultimatum after which she feared she would be kicked out of her living quarters, the Court finds more credible Mr. Leach's

testimony that he merely insisted that Respondent report back to him in two weeks concerning the job she anticipated receiving, and be able to discuss a plan.

At some point in early December, Respondent made arrangements (unilaterally) for R to attend preschool 5 days per week instead of only Monday through Wednesday. Petitioner's mother agreed to pay the additional tuition. On Thursday, December 13, 2012, Petitioner enlisted the help of a friend in her tight-knit religious community to hide R's original birth certificate, in furtherance of a plan to leave and take R to the U.S. The next day, deliberately concealing her plans from her husband and R's grandparents, Respondent picked R up from preschool and took R to her Rabbi's house, where Petitioner and his mother eventually discovered them. Respondent permitted Petitioner limited access to see R that Friday, but not on Saturday or Sunday. On Sunday, Mr. Leach advised the Rabbi that Petitioner had employed counsel and would be serving them with a custody action. The Rabbi and his wife aided Respondent in concealing her plans. On Sunday evening, December 16, they drove Respondent and R across the U.S. border to North Dakota, where she was met by her parents. Her parents drove her and R to Cincinnati, where they arrived on December 18, 2012. Respondent notified Petitioner of her whereabouts via email late on Sunday; he retrieved the email on Monday, December 17.

### III. Legal Analysis

This action arises under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), to which both the United States and Canada are signatories. The United States has implemented the provisions of the Hague Convention through the International Child Abduction Remedies Act ("ICARA"),

42 U.S.C. §11601 et seq. The stated purpose of the Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State." Courts have repeatedly explained that the Convention is intended "to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007); *Friedrich v. Friedrich (Friedrich II)*, 78 F.3d 1060, 1064 (6th Cir. 1996)(internal citations omitted). For that reason, this Court has jurisdiction under the Convention only to determine the merits of the abduction claim; this Court has no jurisdiction to determine "the merits of the underlying custody dispute." *Friedrich II*, 78 F.3d at 1063.

To make out his claim under ICARA, Petitioner must prove four elements: (1) that Canada was the habitual residency of R immediately prior to the date of her removal from Canada; (2) that R's removal by her mother breached Petitioner's Canadian custody rights; (3) that Petitioner was exercising custody (or would have) at the time R was removed; and (4) that R is not yet 16. There is no dispute that R is only 3 years old, and Respondent stipulated that Petitioner and she have equal custody rights to R under Canadian law.

Likewise, it is undisputed that Petitioner was exercising his custody rights at the time of R's removal. Petitioner, Respondent and R were all physically living with Petitioner's parents in Winnipeg, Manitoba, Canada until days before Respondent and R unexpectedly departed to the United States. When Respondent did not return to the home with R on December 14, 2012, Petitioner searched for her and his daughter, sought police intervention, and immediately filed a custody petition in Canada when it became clear that Respondent did not intend to permit him access to the child.

Petitioner learned on Monday, December 17, that Respondent and R were in the United States, and he promptly filed the instant petition two weeks later.

In short, the only issue on which any dispute exists is on whether Canada was R's "habitual residence."  Petitioner contends that Canada was the place of the family's habitual residence immediately before Respondent traveled with R to Cincinnati, Ohio. Respondent denies that Canada was R's habitual residence.  ICARA requires Petitioner to prove R's habitual residence only by a preponderance of the evidence.  *Robert*, 587 F.3d at 993-994.  The Court finds overwhelming evidence in this case that Canada was the child's habitual residence in mid-December 2012, at the time of her wrongful removal.

Respondent appears to make two arguments against this Court's finding that R's habitual residence was Canada: (1) that she and R were not "settled" in Canada because they had resided there for fewer than 6 months when she departed; and (2) that her initial agreement for R to live in Canada was contingent upon Respondent's own circumstances, which changed over time due to the impending breakup of her marriage and additional barriers she faced in order to obtain permanent residency in Canada.  Neither argument has legal merit.[4]

Respondent's first argument must be rejected because the issue presented in this case is wholly separate from the issue of domicile, or the determination of which "home State" a child may be living in under the Parental Kidnapping Prevention Act or Uniform Child Custody Jurisdiction and Enforcement Act, which may require a court to

---

[4]Respondent also testified in her defense that she believed she had a legal right to take R, without her husband's knowledge and against his wishes, back to the U.S.  Respondent's subjective belief, whatever it may have been, has no impact on the Court's analysis that she had no such right under ICARA or Canadian law.

review whether a child has lived with his parents for six consecutive months.  *See, e.g.,* 28 U.S.C. §1738.  By contrast, under ICARA, habitual residence may, at least theoretically, be established in a single day.  Respondent's second argument is equally irrelevant to this Court's inquiry.   The Sixth Circuit has instructed courts to look backward to determine the facts and circumstances, without considering the subjective future intentions of her parents.  *See Robert*, 507 F.3d 981, 989-993; *Friedrich v. Friedrich ("Friedrich I")*, 983 F.2d 1396, 1401 (6th Cir. 1993).  The critical issue is whether R's living arrangements in Canada evinced a "degree of settled purpose from the child's perspective," and whether the circumstances were "sufficient for acclimatization."  *Robert*, 507 F.3d at 989 (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3rd Cir. 1995)).  Where, as in this case, the child is able to develop "a certain routine" and acquire "a sense of environmental normalcy," and is able "to form meaningful connections with the people and places [she] encounters each day," then the court must focus on the child's degree of acclimatization. *Karkkainen v. Kovalchuk*, 445 F.3d 280, 292, (quoting *Whiting v. Krassner*, 391 F.3d 540, 550-551 (3rd Cir. 2004)); *see also Robert*, 507 F.3d at 995-996 (applying the analysis of *Karkkainen* as "helpful guidance.").

When R moved to Canada she was very young, a few months shy of her third birthday.  She lived there in the same household with both parents and her paternal grandparents for four and a half months, a period of time that is appreciably long in a toddler's life.  She was given no indication by either parent that her stay in Canada was for just days or weeks as if on a holiday.  In fact, both parents unequivocally expressed a joint intention, not later than early August 2012, to remain in Canada indefinitely with

her while they made attempts at a fresh start in their personal, financial, and professional lives.  The fact that some of those attempts ultimately failed is of no consequence to the analysis.  Canada had become R's habitual residence within a week of her arrival, not later than August, 2012.  Unlike a newborn who may be less cognizant of her environment, R was able to form many attachments to people and place, and was actively encouraged by her parents to do so.

Because Petitioner has clearly established his right to return of R, this Court must grant the petition absent proof of an exception to ICARA's mandate.  Respondent failed to assert any exception as an affirmative defense in her initial Answer to the petition. However, at the case management conference, Respondent sought expedited discovery to obtain Petitioner's mental health treatment records, based upon an expressed intention to present evidence that R would face a risk of harm if returned to Petitioner.  The referenced exception permits, but does not require, a court to deny a petition for return of an abducted child if there is "a grave risk of physical or psychological harm" to the child.  The exception is to be narrowly construed and must be proven by clear and convincing evidence.

Three Sixth Circuit cases illustrate Respondent's heavy burden in this case. First, in *Freidrich II*, the court explained that "grave danger" exists only if: (1) there is "imminent danger *prior* to the resolution of the custody dispute" such as a "zone of war, famine, or disease" or (2) "a grave risk of harm" such as "serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence…may be incapable or unwilling to give the child adequate protection." *Freidrich II,* 78 F.3d at 1069.

Second, in *March v. Levine*, 249 F.3d 462, 472 (6th Cir. 2001), the court held that a default civil judgment by a Tennessee court that the Petitioner (Father) murdered Mother may "raise a tenuous inference that he might hurt his children" but that such an inference "does not rise to the level of an imminent risk of grave harm." Because the grandparents had wrongfully retained their grandchildren in the U.S., and hadn't shown a "war zone," or "rampant disease" or that Mexico was incapable or unwilling to protect the children, they did not prove their "grave harm" defense. "By invoking the treaty's exceptions in this case, what the Levines truly seek is a determination regarding the adequacy of March as a parent in light of his wife's disappearance. This falls squarely within the 'forbidden territory' of deciding the merits of the parties' custody dispute." *March v. Levine*, 249 F.3d at 472 (6th Cir. 2001)(quoting *Friedrich II*, 78 F.3d at 1065).

Third, the Sixth Circuit offered guidance to trial courts in cases involving claims of physical or psychological abuse in *Simcox v. Simcox,* 511 F.3d 594, 610-11 (6th Cir. 2007). That case included evidence of both physical abuse (repeated beatings, hair pulling, ear pulling, and belt-whipping) and psychological abuse (profane outbursts and verbal abuse of the children's mother in their presence). The abuse was neither isolated nor sporadic. Nearly all of the children suffered from some level of post-traumatic stress disorder. Still, the Sixth Circuit characterized the applicability of the defense as a "close question." The court admonished trial courts to focus their inquiry of "grave risk" on a relatively short time period, since "an inquiry that focuses on too lengthy a period of time runs the risk of turning into a 'child's best interests' analysis, which is not the proper standard under the Convention." See Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10,494, 10,510 (Mar. 26,

1986) (noting that the Article 13b defense may not be used "as a vehicle to litigate (or relitigate) the child's best interests"); *see also Friedrich II*, 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence.").

The Respondent offered little to no evidence at all relevant to the issue of whether R faces a "grave risk" of harm should she be returned to Petitioner in Canada. Petitioner testified that he had been diagnosed with ADD or ADHD as a child, and that he had been prescribed medications for both ADD and for a type of depression for many years.  He further testified that he had not sought any mental health treatment in the past five years, until he began seeing both a psychiatrist and a therapist in Canada in July 2012.  Petitioner's 2012 Canadian mental health records were provided to Respondent and admitted into evidence.[5]  Petitioner, Respondent, Petitioner's parents, and Petitioner's Canadian psychiatrist all testified concerning Petitioner's mental health history and treatment.  However, no one offered any testimony or evidence that would come close to satisfying the "grave risk" standard.

---

[5]The Court denied Respondent's motion for a continuance based upon the asserted need for additional records from New York and Seattle, where the couple had resided prior to their move to Canada. Petitioner testified that the only time he had been seen by any mental health provider in either location was a one-time 30-45 minute free session relating to time management with a therapist in Seattle. Petitioner could not initially recall the therapist's name or credentials, but did send a HPPA release in an attempt to obtain any record that was made to the person he identified, after internet research, as the most likely therapist.  Based on the evidence presented, the Court finds this record to be irrelevant to the issues presented.  *Accord March v. Levine*, 249 F.3d at 474 (discovery not required under ICARA, given the need to use the "most expeditious procedures available.").  In addition, Petitioner testified that he submitted to a full psychiatric evaluation by Child Family Services ("CFS") in New York, as part of an investigation.  The investigation was closed and, according to Petitioner, CFS deemed Petitioner a good caregiver.

Petitioner is, by all accounts, a devoted father to R.  Respondent did not allege that Petitioner has ever been physically abusive in any way toward her or R, nor did she offer credible evidence that Petitioner has ever been verbally abusive or threatening.  In short, this Court heard no evidence whatsoever that Petitioner's relatively mild and well-treated mental health issues present any risk to R, much less a "grave" risk in the immediate future, should she be returned to Canada.  *See, e.g., Jensie v. Jensie*, CIV.A. 2012-203 WOB, 2012 WL 5178168 (E.D. Ky. Oct. 18, 2012)(evidence of physical altercation between parents was "isolated" and "minor," falling far short of grave risk standard); *Cook v. Scott*, 08-12520, 2008 WL 2947692 (E.D. Mich. July 31, 2008)(Father's alleged financial inability to provide was irrelevant, absent proof of constant abuse or general violence, Father's use of marijuana did not constitute a "grave" risk).

### III.  Conclusion and Order

Accordingly, **IT IS ORDERED:**

1.  The petition of Jonathan William Bedder for the return  of his minor child, R, to Canada is **GRANTED immediately**, with Petitioner to assume temporary care, custody and control of R and to accompany her on her return to Canada;

2.  Due to the present financial inability of Respondent to pay for R's return to Canada, Petitioner shall be responsible for those costs at this time.  For the same reasons, each party shall bear their own costs and fees in this matter;

3.  Respondent is not prohibited from accompanying R to Canada to the extent that she is able; however, Petitioner is not required to assist her financially in doing so;

4.   Any peace officer in the State of Ohio and any federal officer shall be commanded to enforce this Order of Return, allowing Jonathan William Bedder, the natural father of R, to remove said child from the United States in order to accompany him back to Canada.   Enforcement of this Order is required under the Hague Convention and ICARA, notwithstanding any objection by Sarah Rebecca Bedder;

5.   Both Petitioner and Respondent shall complete a Request for Entry Into the Children's Passport Issuance Alert Program to prevent their child's future removal back to the United States pending a custody determination by an appropriate Canadian court;

6.   This Order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention, except to the extent that R shall remain in the custody of her father, and shall reside at Petitioner's parents' home at 405 Laidlaw Blvd, Winnipeg, Manitoba R3P 0K8 Canada, until this Order is modified or cancelled by a court of competent jurisdiction in Canada.

<u>s/ Stephanie K. Bowman</u>
Stephanie K. Bowman
United States Magistrate Judge